UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

14 CV 2774

------------------------------------------------------------x

NYDIA RIVERA,

        *Plaintiff,*

   v.

CROWELL & MORING LLP *and*
DIBE PEREZ,

        *Defendants.*

------------------------------------------------------------x

Index Nº:

**COMPLAINT**

RECEIVED APR 17 2014 U.S.D.C. S.D.N.Y. CASHIERS

      Plaintiff Nydia Rivera, by and through her attorneys, The Harman Firm, PC, respectfully alleges as follows:

## PARTIES AND NATURE OF ACTION

    1.    Plaintiff Nydia Rivera ("Rivera") respectfully submits this Complaint against Defendant Crowell & Moring LLP ("Crowell") and Defendant Dibe Perez ("Perez").[1]

    2.    This case is about race discrimination in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e–2000e-17 ("Title VII"), race discrimination including hostile work environment, disability discrimination, and retaliation in violation of the New York City Human Rights Law, N.Y.C. ADMIN. CODE §§ 8-101–31 ("NYCHRL"), and violations of Ms. Rivera's rights under the Family and Medical Leave Act of 1993 as amended, 29 U.S.C. §§ 2601–54 ("FMLA").

    3.    Ms. Rivera who worked as a Patent Legal Secretary at Defendant Crowell and was summarily terminated after being subjected to a hostile work environment due to her disability and race.

---

1. Defendant Perez's first name rhymes with "Phoebe."

4. This action seeks damages for hostile work environment based upon race discrimination because Defendant Crowell's management and Defendant Perez, who acted as Ms. Rivera's supervisor, interfered with Plaintiff's employment and treated her differently from non-Hispanic employees.

5. This action seeks damages for retaliation because Defendants terminated Ms. Rivera after she took time off from work for legitimate medical reasons under the FMLA and then expressed concerns about the status of her employment at Defendant Crowell.

6. Ms. Rivera is a citizen of the City of Chester, County of Orange, New York.

7. At all times relevant hereto, Defendant Crowell, a large international law firm, which previously employed Plaintiff, is based in Washington, D.C. with a branch office in New York City.

## JURISDICTION AND VENUE

8. A District Court "shall have original jurisdiction of all civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

9. An action brought under Title VII "may be brought . . . in the judicial district in which the aggrieved person would have worked but for the . . . unlawful employment practice." 42 U.S.C. § 2000e-5(f)(3).

10. "A civil action may be brought in . . . a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . ." 28 U.S.C. § 1391(b)–(b)(2).

11. Jurisdiction is also proper as an FMLA action may be brought "in any Federal or State court of competent jurisdiction . . . ." 26 U.S.C. § 2617(a)(2).

12. Ms. Rivera was at all relevant times an "eligible employee" within the meaning of the FMLA. She was not exempt under 29 U.S.C. § 2611(2)(B)(i)–(ii), and because she had

"been employed . . . for at least 12 months . . . and . . . for at least 1,250 hours . . . during the previous 12-month period." 29 U.S.C. § 2611(2)(A)–(2)(A)(ii).

13. Jurisdiction is also invoked under 28 U.S.C. § 1367(a) for claims arising under the NYCHRL, based on supplemental jurisdiction over claims that arise from a common nucleus of operative facts, and are so intertwined with other matters pending before the Court as to make exercise of supplemental jurisdiction necessary.

14. Finally, Ms. Rivera filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC").[2] On or about March 6, 2014, it issued a Notice of Right to Sue, which states that her "lawsuit under Title VII . . . must be filed in . . . federal . . . court" within ninety (90) days. *See* Ex. A at 1.

## JURY

15. Plaintiff respectfully requests a trial before a jury.

## STATEMENT OF FACTS

16. Ms. Rivera worked at Defendant Crowell from April 12, 2010 until she was illegally terminated on December 14, 2012.

17. Ms. Rivera, who is Hispanic, worked under the supervision of Defendant Perez, who always showed animosity towards Plaintiff and favored white employees over black and Hispanic employees.

18. Although Defendant Perez is Hispanic, she is ashamed of it and racist against other Hispanics. She attempted to align herself with non-Hispanics in the office, including Caucasians, and especially Ms. Rivera's Jewish colleagues, providing advantages to some employees, but not others, based on race and religion. Defendant Perez attempted to extricate

---

2. EEOC Charge Nº 520-2014-00002. *See* Ex. A.

herself from being Hispanic and repeatedly made reference to the fact that her domestic partner was Jewish.

19.     Defendant Perez unfairly reprimanded Hispanic paralegals, sometimes with no legitimate basis whatsoever, especially the younger ones.

20.     Defendant Perez often declined to reprimand the non-Hispanic paralegals.

21.     White legal assistants were treated differently from the Hispanics on a daily basis. Defendant Perez was rude to Hispanic legal assistants, gave them assignments that were more difficult to complete, and issued worse working schedules to them.

22.     This difference in treatment of employees was particularly juxtaposed concerning one particular receptionist at Defendant Crowell.  Rosemary Andres, who is white, was given advantages that other non-white employees were afraid to even request.  For example, and in contrast to Ms. Rivera, Ms. Andres was allowed to take leave without pay whenever she wanted in order to pursue screenwriting and acting.  Other Hispanic employees were not allowed unpaid time off unless it was an emergency.

23.     Defendant Perez made several derogatory comments about Hispanic people such as: "Spanish[3] people always complain."  This comment was directed at Ms. Rivera after she had to miss work due to illness.

24.     Defendant Perez also stated in front of other staff members that "Puerto Ricans are lazy."  This comment made Ms. Rivera deeply uncomfortable, as she is Puerto Rican and felt like Defendant Perez was targeting her with this comment.

25.     Defendant Perez constantly harassed Ms. Rivera, often without the notice of their colleagues.

---

3.  That is, Spanish-*speaking*; Ms. Rivera is American.

4

26. Defendant Crowell had instructed Ms. Rivera that employees could complain about workplace harassment. The person to whom harassment complaints were to be reported to was Defendant Crowell's firm-wide Human Resource Director, Alyson Guthrie. Ms. Rivera had no other resource to which she could turn for harassment such as a neutral. The problem for Ms. Rivera was that Ms. Guthrie and Defendant Perez were very friendly and discussed personal matters together, which intimidated Ms. Rivera, reasonably led her to believe that she would not have an impartial ear in Ms. Guthrie, and that Ms. Rivera would be terminated immediately if she were to complain to Defendant Perez's friend.

27. In or about April 2012, Defendant Perez, called Ms. Rivera into her office to discuss that Ms. Rivera had only twenty-four (24) hours left of All Purpose Leave ("APL") after the reserved APL was taken, which Ms. Rivera was approved for the following August. Defendant Perez indicated that Defendant Crowell did not approve any leave without pay unless it was an emergency, which is in direct violation of the FMLA.

28. Defendant Perez stated that Ms. Rivera should cancel the time already reserved through August 2012 in order to have more time available at the end of the year. Ms. Rivera responded that the APL she reserved from February to August 2012 had already been approved by Defendant Perez. Based on that approval, Ms. Rivera had made plans to travel outside of the United States in June 2012 and out of state in August 2012 for family events.

29. Defendant Perez replied nonetheless, telling Ms. Rivera that "we can't always go or participate in all family affairs."

30. Ms. Rivera expressed to Defendant Perez that she was very uneasy with what appeared to be premature assumptions by Defendant Perez, implying that Ms. Rivera would presumably get sick by the end of 2012 and would require more APL.

31. Ms. Rivera told Defendant Perez that no one could predict whether one can get sick or not but that she felt in all respects fine, including with regard to her back ailment. Defendant Perez concluded the meeting with a sarcastic comment that whatever Ms. Rivera chose to do was Ms. Rivera's problem.

32. In January 2012, Ms. Rivera was diagnosed with food poisoning and was out of the office on the next day due to continued symptoms of food poisoning. This incident was witnessed by many, including Nicole Welch, who happened upon Ms. Rivera in the restroom, and Human Resources Manager Megan Lang who called for an ambulance. However, instead of putting Ms. Rivera's absence as a "planned absence due to illness," Human Resources indicated that it was an unplanned absence. Despite Ms. Rivera's request, this was never corrected.

33. Defendant Perez told Ms. Rivera that she would not let Ms. Rivera categorize the time as planned illness even though the entire office knew that Ms. Rivera had to be taken to the hospital. Defendant Perez erroneously reasoned that "planned" time requires a prior notice. When Ms. Rivera reminded Defendant Perez that the entire office already knew about the absence before she left the premises, Defendant Perez refused to respond or to correct the miscategorization.

34. On or around October 1, 2012, Ms. Rivera was diagnosed with a severe upper respiratory infection and was under a doctor's care. Ms. Rivera submitted her doctor's instruction and note regarding her absence from work.

35. Ms. Rivera's severe upper respiratory infection made her go over her APL by a single day.

36. On or around October 8, 2012, Ms. Rivera returned to work. Defendant Perez and Human Resources Manager Megan Lang called a meeting with Ms. Rivera. They indicated that

Ms. Rivera was being given a written warning due to having gone over her APL by one (1) day and they implied that her position at the firm was in jeopardy.

37. Still feeling ill and visibly upset, Ms. Rivera told Defendant Perez and Ms. Lang that she did not intentionally miss work, and that she had fallen ill and submitted a doctor's note and instruction that she was under treatment and should not work.  They ignored Ms. Rivera's doctor's note and instead stated that Plaintiff had not managed her APL time effectively and regardless of whether she was ill, the firm did not approve leave without pay unless it was an emergency.

38. Defendant Perez and Ms. Lang indicated that Ms. Rivera's illness was not considered an emergency.

39. Defendant Perez and Ms. Lang continued harassing Ms. Rivera by stating that attorneys had also complained that Ms. Rivera "could not be relied on."  After Defendant Perez and Ms. Lang made this statement, Ms. Rivera became very upset and started to cry because she knew that there was no foundation for this statement and that it was made to harass and upset her.

40. Throughout Ms. Rivera's tenure with Defendant Crowell, Ms. Rivera always received high performance reviews.

41. On or around October 8, 2012, after Ms. Rivera's meeting with Defendant Perez and Ms. Lang, Ms. Rivera met with the attorneys to whom she was assigned, Bruce D. DeRenzi and Andrew Riddles[4] to discuss Defendant Perez and Ms. Lang's statement that Plaintiff could not be "relied on."  Ms. Rivera met separately with each attorney and they both reiterated their

---

4.  Upon information and belief, Mr. Riddles now works for the law firm of Day Pitney LLP.

like of Ms. Rivera and her work. They confirmed to her that neither had made any statements regarding her alleged lack of reliability.

42. On October 9, 2012, in response to the written warning, Ms. Rivera had a telephone conference and meeting with Human Resources Director Alyson Guthrie and Defendant Perez. Ms. Rivera stated to Defendant Perez that, for the record, although she had gone over her APL by one (1) day, it was due to her being sick. She explained that she had been under the care and treatment of a doctor at the time, and was out of the office for only that reason. Ms. Rivera reiterated that she takes her work seriously and that she wanted nothing more than the opportunity to perform with the best of her abilities.

43. At the time, neither Ms. Guthrie nor Defendant Perez suggested that Ms. Rivera's doctor's note regarding her upper respiratory infection could be submitted for FMLA purposes, event though, at a bare minimum, it should have been submitted for that purpose.

44. Ms. Rivera wanted to ask if she could submit her doctor's note for FMLA leave, but felt afraid given Defendant Perez's harassment of her, especially since Ms. Rivera had been on short-term disability in 2011.

45. On or around December 11, 2012, Ms. Rivera went to work feeling ill. For three (3) days prior, she felt ill and did not look well. As each day passed, she felt her health getting worse, but she went to work anyway. Ms. Rivera had a fever and was wheezing, and felt chest pain every time she coughed.

46. Everyone at Defendant Crowell indicated that Ms. Rivera did not look well at all, except for Defendant Perez, who did not acknowledge anything even though Ms. Rivera sat right across from her office.

47. Andrew Riddles, the attorney with whom Ms. Rivera worked, had an office adjacent to her desk. Mr. Riddles told Ms. Rivera that she was looking worse each day and that she should see a doctor.

48. By 10:30 a.m. on December 11, 2012, Ms. Rivera felt her chest tightening and she began having trouble breathing and her cough accelerated to a dry heavy wheeze.

49. Ms. Guthrie told Ms. Rivera "You look very pale, Nydia, you shouldn't have come in if you are this ill."

50. Ms. Rivera though was still scared because she did not know what would happen if she left because she was ill. Ms. Rivera went to Defendant Perez and informed her that she was not feeling well. Defendant Perez asked Ms. Rivera if she wanted her to call an ambulance for her.

51. Ms. Rivera did not want to go to an emergency room by herself and decided to call her doctor and follow her doctor's instructions. Ms. Rivera's doctor told her to leave work and immediately come to her office.

52. Ms. Rivera then asked Defendant Perez whether she could obtain a car service to go to her doctor. Defendant Perez proceeded to inform Ms. Lang of the situation. Ms. Lang asked Ms. Rivera whether she wanted her to call an ambulance as well. Ms. Rivera declined the offer and opted for a car service instead, which was approved by Ms. Lang. As Ms. Rivera and Ms. Lang were waiting, Ms. Rivera expressed to Ms. Lang that she was afraid to comply with her doctor's orders, which could cause her more trouble with Defendants. Ms. Lang told Ms. Rivera, "Don't worry about that, you're sick and you need to take care of yourself. You cannot be here sick and do your job effectively. Your health comes first."

53. Ms. Rivera contacted Ms. Lang as soon as she arrived at the doctor's office.

54. Ms. Rivera's doctor diagnosed her with a lower respiratory infection (bronchitis). The doctor directed complete bed rest, prescribed medication, and forwarded via facsimile a note to Ms. Lang indicating her diagnosis, and that she was under doctor's care and would not be able to return to work until at least December 17, 2012. The nurse at the doctor's office spoke with Defendant Perez as well and with Plaintiff's approval, reported her diagnosis and that she was instructed by doctor to stay home from work.

55. However, while recuperating, Ms. Rivera became incredibly worried and felt like Defendant Perez may suggest that Human Resources do something that would jeopardize Ms. Rivera's employment at Defendant Crowell.

56. Ms. Rivera became even more worried after someone at the firm indicated to her that Defendant Perez and Ms. Lang falsely represented that Defendant Crowell did not provide leave without pay, and that employees who went over their APL would be terminated.

57. However, no such indication exists in Defendant Crowell's employee handbook. Moreover, Defendant Perez's "policy" was not even applied equally to all employees; the one (1) (non-Hispanic) receptionist, Rosemary Andres, was allowed to take leave without pay whenever she wanted.

58. On December 14, 2012, Ms. Rivera, against her doctor's instructions, decided to go back to work because she was terrified of being unfairly and unduly targeted for termination by Defendant Perez. Ms. Rivera was only on her third day of antibiotic therapy and was supposed to rest home resting or else her infection risked turning into pneumonia.

59. Defendant Perez said that she was surprised to see Ms. Rivera at work and told her that she was not expecting her before December 17, 2012. Ms. Rivera told Defendant Perez

10

that it was a good-faith attempt to show that she was serious about her job and that she did not want to jeopardize her position. Defendant Perez shook her head and walked away.

60. At 3:30 p.m. that day, Plaintiff was asked by Defendant Perez to meet with her and Ms. Lang in the conference room and was told that she was being terminated effective immediately for over her APL limit.

61. Ms. Rivera indicated that she had been sick and was diagnosed with bronchitis—as reflected on the doctor's note that they received—and that, against her doctor's instruction, she had decided to come back to work early. Ms. Lang said that although she and Defendant Perez thought Ms. Rivera was visibly ill and although they had received the doctor's note, Ms. Rivera was still being terminated for having gone over the APL in violation of Defendant Crowell's policy.

62. Ms. Rivera said that there was no such policy in Defendant Crowell's employee handbook prescribing termination for going over the APL limit. Defendant Perez replied that leave without pay could only apply in an emergency, which, she believed, Ms. Rivera's was not.

63. Ms. Lang then stated that the termination was not decided only by her and Defendant Perez, but that it "went higher up." Ms. Lang said that Ellen Moran Dwyer, a firm-wide managing partner in Washington, D.C., had made the decision to terminate Ms. Rivera.

64. Neither Defendant Perez nor Ms. Lang indicated, instructed, or offered that Ms. Rivera could be covered by the FMLA due to illness.

65. Additionally, considering Ms. Rivera's substantial accomplishments during her tenure at Defendant Crowell—and the gratitude that she was awarded for her accomplishments—retaliation on the part of Defendant Perez is made clear.

## FIRST CLAIM
## Race Discrimination under Title VII against Defendant Crowell

66. Plaintiff reiterates and incorporates every allegation contained in this Complaint with the same force and effect as though they were separately alleged and reiterated herein.

67. As part of its pattern and practice of employment discrimination Defendant Crowell and its employees and agents, treated Plaintiff in a manner indicative of race discrimination.

68. Defendants knew about the race discrimination in the workplace because Plaintiff brought it to their attention.

69. Defendants failed and refused to take appropriate action to end the discriminatory treatment and conditions, motivated by race discrimination, to which Plaintiff was subjected.

70. As a result, Plaintiff suffered damages for past and future earnings, other employment benefits, attorneys' fees, and emotional injuries in an amount to be determined at trial.

## SECOND CLAIM
## Withholding of Benefits under the FMLA against All Defendants

71. Plaintiff reiterates and incorporates every allegation contained in this Complaint with the same force and effect as though they were separately alleged and reiterated herein.

72. Pursuant to the FMLA, an employee "shall be entitled to a total of 12 workweeks of leave during any 12-month period" if afflicted with "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. §§ 2612(a)(1)–(a)(1)(D).

73. Defendants withheld Plaintiff's unpaid FMLA leave due to Defendant Perez's *animus* toward her.

74. As a result, Plaintiff suffered damages for past and future earnings, other employment benefits, attorneys' fees, and emotional injuries in an amount to be determined at trial.

### THIRD CLAIM
### Hostile Work Environment under the NYCHRL against All Defendants

75. Plaintiff reiterates and incorporates every allegation contained in this Complaint with the same force and effect as though they were separately alleged and reiterated herein.

76. Defendants submitted Plaintiff to a hostile work environment in violation of the NYCHRL.

77. As a result, Plaintiff suffered damages for past and future earnings, other employment benefits, attorneys' fees, and emotional injuries in an amount to be determined at trial.

### FOURTH CLAIM
### Race Discrimination under the NYCHRL against All Defendants

78. Plaintiff reiterates and incorporates every allegation contained in this Complaint with the same force and effect as though they were separately alleged and reiterated herein.

79. It is "an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of . . . race . . . to discharge from employment . . . or to discriminate . . . in terms, conditions or privileges of employment." NYCHRL § 8-107(1)–(1)(a).

80. Defendants subjected Plaintiff to worse treatment than her colleagues because of her race.

81. As a result, Plaintiff suffered damages for past and future earnings, other employment benefits, attorneys' fees, and emotional injuries in an amount to be determined at trial.

## FIFTH CLAIM
### Disability Discrimination under the NYCHRL against All Defendants

82.    Plaintiff reiterates and incorporates every allegation contained in this Complaint with the same force and effect as though they were separately alleged and reiterated herein.

83.    It is "an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of . . . disability . . . to discharge from employment . . . or to discriminate . . . in terms, conditions or privileges of employment." NYCHRL § 8-107(1)–(1)(a).

84.    Defendants subjected Plaintiff to worse treatment than her colleagues because of her disability.

85.    As a result, Plaintiff suffered damages for past and future earnings, other employment benefits, attorneys' fees, and emotional injuries in an amount to be determined at trial.

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants as follows:

(i)    For the First Claim, actual damages to be determined at trial, but in no event less than five hundred thousand dollars ($500,000);

(ii)    On the Second Claim, actual damages to be determined at trial, but in no event less than one million dollars ($1,000,000);

(iii)    On the Third Claim, actual damages to be determined at trial, but in no event less than one million dollars ($1,000,000);

(iv)    On the Fourth Claim, actual damages to be determined at trial, but in no event less than one million dollars ($1,000,000);

(v)    On the Fifth Claim, actual damages to be determined at trial, but in no event less than one million dollars ($1,000,000);

(vi)    Punitive damages;

(vii)   Liquidated damages;

(viii)  Lost wages;

(ix)    Lost employment benefits;

(x)     Pre-judgment interest;

(xi)    Post-judgment interest;

(xii)   Attorneys' fees, disbursements, and other costs; and,

(xiii)  Such other and further relief as the Court may deem just and proper.

Dated: New York, New York       Respectfully submitted by:
       April 17, 2014                   THE HARMAN FIRM, PC

                                        _____
                                        Walker G. Harman, Jr. [WH-8044]
                                        Ronnie L. Silverberg [RS-6881]
                                        1776 Broadway, Suite 2030
                                        New York, New York 10019
                                        (212) 425-2600
                                        wharman@theharmanfirm.com
                                        rsilverberg@theharmanfirm.com