UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 18, 2016

------------------------------------------------------------------- X
                                       :

NYDIA RIVERA,                            :
                                         :

                 Plaintiff,           :
                                         :

               -v-                  :        14-cv-2774 (KBF)
                                         :

CROWELL & MORING L.L.P. and DIBE PEREZ,   :     <u>OPINION & ORDER</u>
                                         :

              Defendants.       :
                                         :
------------------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

     Plaintiff Nydia Rivera brought this action in April 2014 against her former employer, defendant Crowell & Moring L.L.P. ("Crowell"), and former supervisor at Crowell, defendant Dibe Perez ("Perez"), alleging claims for race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e <u>et seq.</u>, unlawful withholding of benefits in violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 <u>et seq.</u>, and race and disability discrimination and hostile work environment in violation of the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 <u>et seq.</u>

     Plaintiff was employed as a legal secretary by Crowell from April 2010 until she was discharged in December 2012.  Plaintiff alleges that she was unlawfully discharged on the basis of race, national origin and disability discrimination; defendants counter that plaintiff was lawfully discharged for purposefully exceeding her allotted leave time despite receiving numerous warnings not to do so.

Pending before the Court is defendants' motion for summary judgment on the ground that no genuine issue of fact remains as to any of plaintiffs' claims and that defendants are entitled to judgment as a matter of law.  For the reasons set forth below, defendants' motion for summary judgment is granted as to plaintiff's FMLA and Title VII claims, and the Court declines to exercise supplemental jurisdiction as to plaintiff's NYCHRL claims.  Accordingly, this action is dismissed.

I.    FACTUAL BACKGROUND

A.    <u>Parties</u>

Defendant Crowell is an international law firm with its headquarters in Washington, D.C.; Crowell opened its New York office in 2006.  (Defs.' 56.1 ¶ 9.)[1] Plaintiff Nydia Rivera, who is Puerto Rican and Hispanic, was hired by Crowell as a Patent Legal Secretary in April 2010 and was employed in that role until she was terminated on December 14, 2012.  (Defs.' 56.1 ¶¶ 3, 8.)  Plaintiff was an hourly employee and deductions from her pay were calculated based on an hourly rate. (Defs.' 56.1 ¶ 4.)

Defendant Dibe Perez, whose parents were born in Cuba and who considers herself Hispanic, had interviewed plaintiff for the position in 2010 and recommended that she be hired.  (Defs.' 56.1 ¶¶ 12, 14.)  Plaintiff reported to Perez, who served as Office Administrator of Crowell's New York office for the duration of

---

[1] The notation "Defs.' 56.1" refers to defendants' statement of undisputed material facts, submitted under Local Rule 56.1.  This decision relies only on those facts that plaintiff did not dispute with citations to admissible evidence in her Rule 56.1 counterstatement (which the Court refers to as "Pl.'s 56.1 Cstmt.").  <u>See</u> Local Rule 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").  The notation "Pl.'s 56.1" refers to the one additional undisputed material fact that plaintiff affirmatively offered as part of her Rule 56.1 counterstatement.

plaintiff's employment.  (Defs.' 56.1 ¶¶ 10, 15.)  Perez supervised between 20 and 30 employees at any given time during her eight-year tenure with Crowell.  (Defs.' 56.1 ¶ 15.)  Perez, in turn, was supervised by Alyson Guthrie, Crowell's Chief Human Resources Officer, who worked in Crowell's Washington, D.C. office.  (Defs.' 56.1 ¶ 10.)

      B.    <u>Crowell's Employee Leave Policies</u>

Crowell provides time off to hourly employees, such as plaintiff, in a lump sum amount that is referred to as "All Purpose Leave" or "APL."  (Defs.' 56.1 ¶ 22.)  This singular allocation of time off can be used in hourly increments.  (Defs.' 56.1 ¶ 22.)  Pursuant to Crowell's APL policy, deductions are made from APL allocations for full-day absences and where an employee arrives late or leaves early if such time cannot be made up during the same work day.  (Defs.' 56.1 ¶ 22.)  APL encompasses time off for vacation, planned personal leisure activities, sickness, and other unplanned events.  (Defs.' 56.1 ¶ 23.)  Crowell pays up to 35 hours of unused APL for employees who have a 27 day annual accrual rate.  (Defs.' 56.1 ¶ 24.)  Plaintiff received 27 days of APL and one floating holiday per year, as well as nine pre-scheduled paid holidays.  (Defs.' 56.1 ¶ 28.)

An employee who exceeds her APL allotment for the year is put into "Leave Without Pay" or "LWOP" status.  (Defs.' 56.1 ¶ 36.)  Plaintiff concedes that Perez established a rule permitting an employee to exceed APL in "emergency" situations, and applied this rule only to plaintiff.  (Pl.'s 56.1 Cstmt. ¶ 32.)  This rule was applied to plaintiff on December 3, 2012, when she was advised that the sudden hospitalization of her mother was considered an "emergency"; at that time, Perez

told plaintiff, "Nydia if you have to be with your mom, this is deemed an emergency." (Defs.' 56.1 ¶ 34.)

According to Crowell's Business and Employment Policy Manual (the "Employment Manual"), employees must avoid exceeding their allocated time off in order to avoid imposing additional burdens on attorneys and other secretaries. (Defs.' 56.1 ¶ 29.)  The Employment Manual states that "Employees are responsible for managing their leave in such a way that the Firm is given sufficient advance notice of time off (planned absence) and unplanned absences are kept to a minimum.  Excessive unplanned absence may result in disciplinary action up to and including discharge." (Defs.' 56.1 ¶ 30.)  Employees are allowed to request planned time off at any time and APL may be scheduled and used before it has actually accrued.  (Defs.' 56.1 ¶ 47.)  Plaintiff acknowledged in writing that she received and read the Employment Manual.  (Defs.' 56.1 ¶ 29.)  Plaintiff asserts that Crowell's policy as to when LWOP could be used in case of an emergency was unclear. (Harman Decl., Ex. A, Rivera Aff. ¶¶ 56, 65.)

Crowell's Employment Manual also includes an FMLA policy that describes employee eligibility, the application process, entitlement to intermittent and reduced-schedule leave, and contains a section on the provisions of the FMLA related to the term "serious health conditions." (Defs.' 56.1 ¶¶ 94-95.)  Plaintiff read the FMLA policy at least three times during her employment.  (Defs.' 56.1 ¶ 96.) Between April 2010 and August 2014, Crowell provided 19 FMLA leaves to employees supervised by Perez, not including the FMLA leave that plaintiff took for

a back condition in 2011 (which is explained further below).  (Defs.' 56.1 ¶ 97.)

Perez did not have the authority to approve or deny employee requests for FMLA

leave.  (Defs.' 56.1 ¶¶ 96, 98.)  Under Crowell's policy, FMLA-qualifying absences

are deducted from an employee's APL balance.  (Defs.' 56.1 ¶ 43.)  Time spent on

FMLA leave, however, is considered "protected," meaning that APL used

simultaneously with FMLA is not considered when Crowell reviews whether an

employee has failed to manage APL appropriately.  (Defs.' 56.1 ¶ 43.)  Other than in

the present case, Crowell has never had a complaint filed against it relating to a

New York office employee's request for FMLA leave.  (Defs.' 56.1 ¶ 97.)

    C.    <u>Plaintiff's Absences at Crowell</u>

        1.    <u>2010</u>

Plaintiff exhausted her APL allowance in 2010, her first year of employment

at Crowell; she went into LWOP status for three days that year.  (Defs.' 56.1 ¶ 41.)[2]

On or about October 4, 2010, plaintiff reported that her school-age daughter had the

flu, causing plaintiff to be absent from work.  (Defs.' 56.1 ¶ 39.)  In an email to Perez

on October 4, plaintiff joked about the absence caused by her daughter's illness,

saying that Perez had "jinxed" her by having previously suggested that plaintiff

cancel some of her planned vacation days due to her diminished APL balance.

(Defs.' 56.1 ¶ 40.)  On December 13, 2010, plaintiff had to leave work early because

---

[2] Although at one point in her Rule 56.1 counterstatement plaintiff denies that she exhausted her APL balance in 2010 (Pl.'s 56.1 Cstmt. ¶ 38), she later concedes that she was in LWOP status for nearly three days that year (Pl.'s 56.1 Cstmt. ¶ 41).  These positions are inconsistent, and the Court therefore construes plaintiff as admitting that she exceeded her APL balance and went into LWOP status in 2010.  Cf. <u>Overseas Direct Imp. Co. v. Family Dollar Stores Inc.</u>, 929 F. Supp. 2d 296, 308 (S.D.N.Y. 2013) (concluding that deposition testimony inconsistent with declaration and Rule 56.1 counterstatement is controlling on motion for summary judgment).

her daughter was locked out of the house; on December 14, plaintiff was late for work because her daughter's school had a delayed opening.  (Defs.' 56.1 ¶ 41.)  As stated above, as a result of unplanned absences and her decision not to cancel a vacation earlier in the year, plaintiff was in LWOP status for nearly three days in 2010.  (Defs.' 56.1 ¶ 41.)

2.   2011

In 2011, plaintiff underwent medical treatments for a back condition.  (Defs.' 56.1 ¶ 42.)  This condition required plaintiff to be absent for two separate periods for which Crowell provided her FMLA leave.  (Defs.' 56.1 ¶ 42.)  Later in 2011, plaintiff requested unplanned time off and schedule changes unrelated to any medical condition; these absences included: (1) leaving work early on September 22 to attend a teacher's "open house" for her daughter, (2) arriving late for work on October 19 due to weather-related delays, (3) leaving early on October 26 to take her daughter to the doctor, (4) leaving early on December 1 to pick up her daughter from school, (5) taking the day off on December 8 because the power was out at her daughter's school, and (6) leaving early on December 10 to attend her daughter's school event.  (Defs.' 56.1 ¶ 44.)[3]

On October 11, 2011, Perez sent plaintiff an email regarding plaintiff's low APL balance.  (Defs.' 56.1 ¶ 45.)  Perez also sent similar emails to four Caucasian secretaries and eight other non-secretarial employees.  (Defs.' 56.1 ¶ 45.)  Plaintiff was not disciplined for ultimately exceeding her APL allocation in 2011 because

---

[3] During the period of plaintiff's employment, she lived in the town of Chester in Orange County, New York, approximately 60 miles from Crowell's New York office.  (Defs.' 56.1 ¶ 5.)

Crowell did not consider plaintiff's use of APL in conjunction with FMLA leave to be mismanagement of her APL balance.  (Defs.' 56.1 ¶ 46.)

       3.   <u>2012</u>

By mid-January 2012, plaintiff had scheduled 20 days off for the 2012 calendar year, including two summer vacations totaling 16 days.  (Defs.' 56.1 ¶¶ 48-51.)[4]  Perez approved plaintiff's requested time off despite a concern that plaintiff might not be left with a sufficient APL balance to account for unplanned absences.  (Defs.' 56.1 ¶ 52.)  Plaintiff took several unplanned days off that were charged to her APL in early 2012, including to take her daughter to a doctor's appointment, and several other absences for reasons that plaintiff later did not recall.  (Defs.' 56.1 ¶¶ 53-54.)

By mid-April, if plaintiff took all of her requested planned leave, she would have had only 20 hours left to use for the rest of the year.  (Defs.' 56.1 ¶ 55.)  Plaintiff met with Perez on April 16, 2012, at which time Perez suggested that plaintiff cancel some of her previously scheduled time off to ensure that she would not exceed her APL for the year.  (Defs.' 56.1 ¶ 56.)  Just as plaintiff had done in 2010, plaintiff refused to cancel any of her scheduled time off because she believed it was premature to assume that she was going to get sick after August (i.e. after her second planned vacation) such that she would exceed her allotted APL.  (Defs.' 56.1 ¶ 56.)  On April 19, 2012, Perez had a conversation with plaintiff regarding her recent absences and explained that time out of the office "may be an FMLA event

---

[4] On or about December 29, 2011, plaintiff had requested two days of APL for January 17 and 19, 2012 for her own medical treatments; although those appointments were canceled, she still took the days off for appointments for her daughter.  (Defs.' 56.1 ¶ 48.)

and suggested that we could bring Megan [Lang, a Crowell Human Resources Manager,] into the loop for confirmation and information procedural specifics." (Defs.' 56.1 ¶ 57.)  Plaintiff stated that she didn't want to go through the paperwork and told Perez that none of her leave to date in 2012 could be allocated towards her FMLA balance.  (Defs.' 56.1 ¶ 57.)  Plaintiff was subsequently absent on May 21, 2012 due to back pain; plaintiff told Perez that she did not believe she needed to request FMLA leave based on what she had been told by her doctor.  (Defs.' 56.1 ¶ 59.)  On May 22, 2012, Perez directly asked plaintiff if she would cancel some of her planned vacation—plaintiff refused.  (Defs.' 56.1 ¶ 59.)

On Thursday, October 4 and Friday, October 5, 2012, plaintiff called in sick. (Defs.' 56.1 ¶ 60.)  On October 5, plaintiff visited her physician, Dr. Ilora Rafique. (Defs.' 56.1 ¶ 118.)  Plaintiff testified at her deposition that the October 5 appointment was for a sinus condition (Defs.' 56.1 ¶ 119), whereas Dr. Rafique testified that plaintiff's reason for the visit was low back pain related to her prior lumbar back problem, and for a "runny nose."  (Defs.' 56.1 ¶ 120.)  Dr. Rafique's notes from the October 5 appointment show that plaintiff denied having fever, chills, fatigue, chest pain or swollen glands.  (Defs.' 56.1 ¶ 121.)  Dr. Rafique also testified that plaintiff's respiratory condition was considered normal, and her chest and lungs were clear.  (Defs.' 56.1 ¶ 122.)  Dr. Rafique testified that it would not surprise her, based on her October 5 examination, if plaintiff had gone to work on October 4 and October 5.  (Defs.' 56.1 ¶ 124.)  Plaintiff's absence on October 4 was

8

charged to her remaining seven hours of APL; having thus exceeded her APL balance, plaintiff's absence on October 5 was charged as LWOP.  (Defs.' 56.1 ¶ 61.)

Plaintiff returned to work on Monday, October 8, 2012, and produced a form letter from Dr. Rafique stating, "Please excuse Nydia Rivera from work/school from Oct. 4 to Oct. 5.  Patient was under my care and can return to work/school on October 8, 2012."  (Defs.' 56.1 ¶¶ 126-27.)  On the day of her return, plaintiff met with Perez and Lang concerning her October 4 and 5 absences.  (Defs.' 56.1 ¶¶ 62, 126.)  At the October 8 meeting, plaintiff was given a memo that restated past warnings regarding her mismanagement of APL, reminded plaintiff of her past refusals to modify her vacation plans to preserve an APL balance, advised her that she had no remaining APL, and warned plaintiff that she could be discharged if she had any additional days in LWOP status.  (Defs.' 56.1 ¶¶ 63, 129-30.)  The October 8 memo was drafted jointly by Perez and Lang, and was approved by Guthrie before it was finalized and given to plaintiff.  (Defs.' 56.1 ¶ 64.)

On October 15, plaintiff responded with a three-page memo to Perez (with copies sent to Guthrie and Lang) that stated, "Although my feeling ill was not a life threatening situation, per say [sic], I felt ill enough to warrant myself to seek medical attention as quickly as possible for which prescription medication was prescribed, as well as rest."  (Defs.' 56.1 ¶¶ 65, 67.)  Regarding her refusal to accept Perez's suggestion on May 22 that she cancel some of her planned APL, plaintiff wrote "although it laid in the 'back of my mind' I was going to try and not be too concerned for the most part about the time available to me for the remainder of the

year after August, as I felt positively, perhaps a bit prematurely, that all would be fine." (Defs.' 56.1 ¶ 69.)  Plaintiff's letter went on to state, "I took a chance in allowing such little time left over by August with the good faith that things would be uneventful." (Defs.' 56.1 ¶ 70.)  The October 8 memo made no reference to plaintiff's potential eligibility for FMLA leave as to the October 4 and 5 absences. (Defs.' 56.1 ¶ 132.)

On the morning of Tuesday, December 11, 2012, plaintiff emailed a friend at the office, saying "Have a cold again;" she concluded her email by saying "But trooping it through I guess." (Defs.' 56.1 ¶ 135.)  On Wednesday, December 12, 2012, plaintiff reported to work but left at approximately 11:00 a.m. to see Dr. Rafique because she felt sick.  (Defs.' 56.1 ¶¶ 71, 136.)  After receiving an inquiry from either Perez or Lang as to whether a car service or ambulance should be called to take her to Dr. Rafique's office (located in the Bronx), plaintiff requested a car service.  (Defs.' 56.1 ¶¶ 137-38.)  Later that day, Dr. Rafique provided a note by facsimile stating that plaintiff should be excused from work until Sunday, December 16, and that she could return to work on Monday, December 17; the note did not state the medical condition causing the absences.  (Defs.' 56.1 ¶ 140.)  Also on December 12, plaintiff left a voicemail for Perez stating that if she felt better, she would return to work on Friday, December 14.  (Defs.' 56.1 ¶ 141.)  Plaintiff did in fact return to work on that day.  (Defs.' 56.1 ¶ 147.)  Dr. Rafique testified that the reason for plaintiff's December 12 appointment was "allergic symptoms, runny nose and sneezing." (Defs.' 56.1 ¶ 142.)  Dr. Rafique testified that her December 12

10

examination of plaintiff showed that plaintiff's eyes, ears, sinuses, mouth, airway, chest and lungs were normal, and her vital signs were good.  (Defs.' 56.1 ¶ 144.)  Dr. Rafique prescribed an antibiotic.  (Defs.' 56.1 ¶ 145.)  Dr. Rafique testified that, based on her findings on December 12, it would not surprise her if plaintiff was able to work on December 14.  (Defs.' 56.1 ¶ 150.)

Plaintiff's partial day absence on December 12, and her full day absence on December 13, were not covered by the FMLA; as a result plaintiff went further into LWOP status.  (Defs.' 56.1 ¶ 73.)

D.    Plaintiff's Termination

At approximately 4:00 p.m. on December 14, 2012, plaintiff met with Lang and Perez, at which time Lang informed plaintiff that she was being terminated. (Defs.' 56.1 ¶ 74.)  The decision to terminate plaintiff was made by Guthrie when she became aware that plaintiff had returned to work that day.  (Defs.' 56.1 ¶¶ 75-76, 152.)  Plaintiff asserts that during the meeting, because of her ongoing sickness and the stress of being fired, she needed her inhaler and Perez brought it to her. (Rivera Aff. ¶ 61.)  Plaintiff asserts that Perez knew that plaintiff "had ongoing respiratory problems and kept an inhaler" with her to treat her asthma.  (Rivera Aff. ¶¶ 62-63; see Pl.'s 56.1 ¶ 1.)[5]  Plaintiff asserts that no one at the termination meeting inquired as to her health or whether she needed additional leave, FMLA leave, or disability.  (Rivera Aff. ¶ 64.)  Plaintiff concedes that "Guthrie terminated [plaintiff] without knowledge of her medical condition."  (Pl.'s 56.1 Cstmt. ¶ 154.)

---

[5] Dr. Rafique's affidavit states that she first diagnosed plaintiff as having "chronic sinusitis and chronic rhinitis in 2012."  (Harman Decl., Ex. Q, Rafique Aff. ¶ 3.)

Guthrie and Perez were aware during plaintiff's employment that she required an extended leave in 2011 for a back condition and that she had migraine headaches from time to time.  (Defs.' 56.1 ¶ 154.)

On December 15, 2012, plaintiff sent a nearly three-page, single-spaced email to Perez, Guthrie, and Ellen Dwyer, Crowell's Managing Partner.  (Defs.' 56.1 ¶ 195.)  In her email, plaintiff complained extensively about the termination of her employment, and about Perez in particular.  (Defs.' 56.1 ¶ 78.)  Plaintiff's email made no reference to issues of race, disability, the FMLA, a hostile work environment, or any other claims alleged in this action.  (Defs.' 56.1 ¶¶ 78, 196.)  Plaintiff's email did refer to a comment that Perez had allegedly once made in the lunch room that she did not "really like to hire attractive women because they can be a distraction"—plaintiff's email questioned whether she was fired because she fell into this category.  (Defs.' 56.1 ¶ 197.)  Plaintiff's email also twice described her October and December 2012 absences as "temporary illnesses."  (Defs.' 56.1 ¶ 153.)  During her deposition, plaintiff expressed her belief that an employee should never be fired if he or she is out sick, even for a day, so long as he or she can obtain a doctor's note verifying illness, regardless of whether the employee has exhausted his or her entire APL allocation.  (Defs.' 56.1 ¶ 79.)

On October 4, 2013, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging a violation of the FMLA and discrimination on the basis of her national origin, color, and disability.  (Defs.' 56.1 ¶ 2.)  In her charge, plaintiff stated, "The events leading up to my charges took

place between April of 2012 through December 14, 2012." (Defs.' 56.1 ¶ 2; see also Guthrie Decl., Ex. 40.) Plaintiff's charge alleged, "On December 10, 2012 I had a relapse of the infection [from October] and but [sic] this time was complicated with an upper and [sic] respiratory infection, Bronchitis, which at the time again left me in complete incapacitation to perform my job accordingly. Although I presented myself at work feeling very ill . . . I went to work but I could not continue doing my job effectively." (Defs.' 56.1 ¶ 133.) On March 6, 2014, the EEOC issued plaintiff a Notice of Right to Sue letter. (ECF No. 2-1.)

E.   Hostile Work Environment Allegations

For the duration of plaintiff's employment, Crowell had in place an equal employment opportunity ("EEO") policy forbidding discrimination on the basis of, inter alia, race, national origin, disability, and any other classification protected by law. (Defs.' 56.1 ¶ 191.) The EEO policy states that anyone who feels he or she has been discriminated against or harassed is expected to report such conduct immediately to Guthrie or Dwyer. (Defs.' 56.1 ¶ 192.) Plaintiff testified that she never discussed the allegations she made in the instant complaint with anyone at Crowell, including Guthrie or Dwyer, while she was employed there. (Defs.' 56.1 ¶ 193.)

Plaintiff claims that she was subjected to a hostile work environment based on her Hispanic race and Puerto Rican national origin. (Compl. ¶¶ 66-70, 75-77, ECF No. 2; Defs.' 56.1 ¶¶ 155-56.) Plaintiff's hostile work environment allegations consist of four alleged comments made by Perez. (Perez's parents were born in Cuba and Perez is of Hispanic background. (Defs.' 56.1 ¶ 12.)) First, plaintiff

13

claims that Perez joined a conversation in Crowell's lunch room sometime in 2011, during which she referred to Puerto Ricans as "lazy" and said that "Spanish people always complain." (Defs.' 56.1 ¶ 157.) Plaintiff stated that other legal secretaries, including Lynn Petri, Mary Ellen Cerbone, and Mitsy Gonzalez were in the lunch room at the time, and that Petri and Cerbone are Caucasian. (Defs.' 56.1 ¶ 158.) Second, plaintiff claims that, at the end of 2011 or beginning of 2012, she was part of a conversation with Perez and Emily Ayala (another legal secretary) regarding the difficulties of juggling time to work and care for children. (Defs.' 56.1 ¶ 161.) During the conversation, Perez allegedly stated that her mother was her daughter's "primary caretaker" and said that "usually Spanish grandmothers are more hands on." (Defs.' 56.1 ¶ 161.) Third, plaintiff claims that, in April 2012, during the conversation in which Perez warned plaintiff about excessive use of APL, Perez said "Spanish people tend to spend more than they have." (Defs.' 56.1 ¶ 160.) Fourth, plaintiff alleges that at times she could overhear Perez—whose office was directly across from plaintiff's desk—cursing in Spanish, which plaintiff said made her "uncomfortable" (although there is no evidence that plaintiff ever complained about Perez's cursing while employed at Crowell). (Defs.' 56.1 ¶ 159.) At her deposition, plaintiff could not remember any additional incidents supporting her hostile work environment claim other than those stated above. (Defs.' 56.1 ¶ 162.)

    F.    <u>Race Discrimination / Disparate Treatment Allegations</u>

    Plaintiff alleges that she was discriminated against on the basis of her Hispanic race and Puerto Rican origin, claims that are solely directed at conduct engaged in by Perez. (Compl. ¶¶ 66-70, 78-81; Defs.' 56.1 ¶¶ 163-90.) Plaintiff

testified that she never discussed the below allegations with anyone at Crowell while employed there.  (Defs.' 56.1 ¶ 193.)  Plaintiff testified at her deposition that Perez was "too friendly" with attorneys (but mentioned only one) and was more friendly with Caucasian secretaries (naming only three).  (Defs.' 56.1 ¶ 167.)  Plaintiff testified that Perez unfairly reprimanded Hispanic secretaries—by which she meant herself, Emily Ayala, and [REDACTED][6].  (Defs.' 56.1 ¶ 167.)  Plaintiff also testified that she believed Perez "targeted" Lynn Petri, a Caucasian legal secretary.  (Defs.' 56.1 ¶ 198.)  The only reprimand that Ayala recalled receiving from Perez in her deposition ([REDACTED] was not deposed) was an instance in which Perez told Ayala that her skirt was too short and her bra strap was showing; Ayala agreed with Perez's assessment and said that Perez had not threatened her in this exchange.  (Defs.' 56.1 ¶ 168.)  Plaintiff testified that she believed Perez was "ashamed" of being Hispanic, stating that her reason for this belief was that Perez spoke of living with a white person and once said that her ex-husband was Puerto Rican and she would never date another Hispanic person.  (Defs.' 56.1 ¶ 163.)

Plaintiff further testified that Perez was rude to Hispanic secretaries, gave them assignments that were more difficult to complete, and issued worse working schedules to them (again, plaintiff was referring specifically to only Ayala and

---

[6] Because defendants' motion for summary judgment and all related papers were filed under seal, on February 18, 2016, the Court provided the parties with this Opinion & Order and asked them to submit any proposed redactions not later than 5:00 p.m. on February 22, 2016.  (ECF No. 40.) Defendants responded to the Court's Order on February 22, 2016, requesting certain minor redactions to names and other identifying information of current employees uninvolved in this litigation to prevent likely embarrassment and potential disruption to the workplace.  While the Court does not believe that such redactions are necessary as a matter of law, under the particular circumstances present here, the Court has accepted defendants' very minor redactions to the publicly-filed version of this decision.

[REDACTED]).  (Defs.' 56.1 ¶ 169.)  Although plaintiff testified that she, Ayala and [REDACTED] spoke of difficulty in getting a "quick yes" from Perez regarding schedule changes of a day or longer, the record shows that Perez regularly agreed to plaintiff's schedule change requests, including in 2012 on the dates of January 31, April 23, June 1, June 15, August 22, and October 25.  (Defs.' 56.1 ¶¶ 170-71.)  Plaintiff alleged one occasion in which she requested a change in schedule while her commute was being impacted by train track repairs, but Perez actually approved this requested schedule change.  (Defs.' 56.1 ¶ 178.)

Ayala testified at her deposition that Perez reassigned her from the Insurance Practice Group to another group of attorneys, which Perez explained was based on a request from the Insurance Group attorneys relating to Ayala's performance.  (Defs.' 56.1 ¶ 172.)  Ayala testified that Perez told her that she could handle an attorney in the new group that was reportedly difficult to work with because Ayala "had thick skin" and would "be able to put him in his place"; Ayala believed the "thick skin" remark was a reference to a Hispanic stereotype.  (Defs.' 56.1 ¶ 173.)  Ayala testified that she got along with the attorneys to whom she was assigned after the Insurance Group and that [REDACTED], a Caucasian secretary reassigned [REDACTED], later complained about those attorneys and about Perez.  (Defs.' 56.1 ¶ 174-76.)  Ayala also testified that [REDACTED], a Caucasian secretary, told Ayala that Perez switched her [REDACTED] schedule so that she could support a new attorney and that she was so upset about this change that she was thinking about resigning.  (Defs.' 56.1 ¶ 177.)  Non-Hispanic secretaries also

complained about Perez; Ayala testified that there was no secretary at Crowell who liked her, that Perez was a "bitch" and that this affected all secretaries, including Caucasians, African-Americans, Hispanics and Asians.  (Defs.' 56.1 ¶¶ 199-202.)

Plaintiff also alleges that Perez "constantly harassed" her regarding her APL. (Defs.' 56.1 ¶ 180.)  Emily Fletcher, Manager of Human Resources in Crowell's D.C. office, prepared "Employee Relations, Recruitment, Support Services and Training Recap" reports for Guthrie.  (Defs.' 56.1 ¶ 182.)  In one such report, dated October 14, 2011, Fletcher noted that on October 13, 2011 she counseled Perez to send emails to all New York staff with low APL balances because of recent requests by employees to take time off in LWOP status.  (Defs.' 56.1 ¶ 182.)  Anne Acosta, Manager of Crowell's Human Resource Management Systems (who was located in the D.C. office), sent Perez an email on September 18, 2012 with the names of four employees who, as of that date, had APL balances of less than five days so that Perez could discuss this fact with them.  (Defs.' 56.1 ¶ 183.)  Two of the employees were non-Hispanic, and two, including plaintiff, were Hispanic.  (Defs.' 56.1 ¶ 183.) Of those four employees, plaintiff had the lowest remaining APL balance of 7.25 hours.  (Defs.' 56.1 ¶ 183.)  Perez was required to monitor New York employees' APL usage and reported, as an example, having sent cautionary emails to thirteen employees, four of whom were Hispanic, in October 2011.  (Defs.' 56.1 ¶ 184.)

Plaintiff alleged that Crowell's receptionist, Rosemary Andress, who is Caucasian, was treated more favorably than Hispanic employees with regard to APL policies.  (Defs.' 56.1 ¶ 185.)  Andress had joined Crowell when Crowell

acquired the law firm of King, Pagano & Harrison ("KPH"), including its 20 lawyers and that firm's support staff.  (Defs.' 56.1 ¶ 185.)  KPH had permitted Andress, who was a Julliard-trained theater director, to take time off anytime she had a directing opportunity, regardless of whether she had a paid leave balance.  (Defs.' 56.1 ¶ 185.)  The KPH partners insisted during acquisition discussion with Crowell that Andress be allowed to continue this practice, and this request was granted.  (Defs.' 56.1 ¶ 185.)  Perez was not involved in the decision to allow this accommodation and lacked any authority to modify or cancel it.  (Defs.' 56.1 ¶ 186.)  Andress was the sole employee at the New York office who was granted this sort of exception to the APL policy.  (Defs.' 56.1 ¶ 185.)

Plaintiff alleged that Perez told plaintiff that she was considered unreliable by her assigned attorneys, which plaintiff considered harassment.  (Defs.' 56.1 ¶ 187.)  In her 2011 performance evaluation, the attorneys for whom plaintiff worked stated, inter alia, "while Nydia has good document skills, she needs to be more careful in checking her work, including proofing it for form and substance," "Nydia needs to be a bit more . . . proactive in asking if anything needs to be done or if she can be of assistance, rather than just sitting at her desk and waiting for assignments to be brought over," Nydia "[n]eeds to understand the objectives clearly so that she can be more independent and pro-active," and "I can't say . . . that I've observed much enthusiasm for the job."  (Defs.' 56.1 ¶ 189.)  In January 2011, Scott Bittman, an attorney to whom plaintiff was assigned to assist, complained to Perez that he could not get work done by plaintiff, that she gave him an "attitude" when

he pressed her for work, and asked that another secretary be reassigned to him. (Defs.' 56.1 ¶ 190.)  Plaintiff asserts that she met or exceeded all expectations at work and "always received good performance reviews from the attorneys [she] supported."  (Rivera Aff. ¶ 5.)

## II.   PROCEDURAL HISTORY

Plaintiff filed her complaint on April 17, 2014, alleging claims against Crowell and Perez for race discrimination in violation of Title VII, 42 U.S.C. § 2000e et seq., unlawful withholding of benefits in violation of the FMLA, 29 U.S.C. § 2601 et seq., and claims for race and disability discrimination, and hostile work environment due to her disability and race, in violation of the NYCHRL, N.Y.C. Admin. Code § 8-101 et seq.  (ECF No. 1.)  Defendants answered the complaint on May 9, 2014.  (ECF No. 8.)

On May 18, 2015, defendants moved for summary judgment as to all claims. (ECF No. 31.)  The motion papers were filed under seal.  The motion became fully briefed on July 27, 2015.  (ECF No. 38.)  On January 15, 2016, this action was reassigned to the undersigned.  On January 22, 2016, the Court issued an order informing the parties that it intended to grant defendants' motion, and that a written decision would be forthcoming.  (ECF No. 39.)

## III.   LEGAL STANDARDS

### A.   Summary Judgment

Summary judgment may not be granted unless a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor."  Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the nonmoving party's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial.  Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586

(1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  The Court should not accept evidence presented by the nonmoving party that is so "blatantly contradicted by the record . . . that no reasonable jury could believe it."  Scott v. Harris, 550 U.S. 372, 380 (2007).

     B.     FMLA

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA.  29 U.S.C.A. § 2615(a)(1); see Nevada Dep't of Human Res. v. Hibbs, 538 U.S. 721, 724-25 (2003).  Under the FMLA, an eligible employee is entitled to "a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1); see Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 174 (2d Cir. 2006).  The FMLA defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves–inpatient care in a hospital, hospice, or residential medical care facility; or continuing treatment by a health care provider."  29 U.S.C. § 2611(11).

"The FMLA was not intended to cover short-term conditions for which treatment and recovery are very brief."  Brown v. Omega Moulding Co. Ltd., No. 13-CV-5397 (SJF)(ARL), 2014 WL 4439530, at *5 (E.D.N.Y. Sept. 9, 2014) (quotation marks omitted); see also Bonkowski v. Oberg Indus., Inc., 787 F.3d 190, 196 (3d Cir. 2015) ("'[T]he congressional reports . . . indicate that the term [serious health condition] was not intended to cover short-term conditions for which treatment and

recovery are very brief, as Congress expected that such conditions would be covered by even the most modest of employer sick leave policies.'" (quoting The Family & Medical Leave Act, 60 Fed.Reg. 2180, 2191-92 (Jan. 6, 1995) (final rule))).

Under the Department of Labor's regulations, a serious health condition involving continuing treatment by a health care provider requires, <u>inter alia</u>: (1) a "period of incapacity of more than three consecutive, full calendar days," (2) "[a]ny period of incapacity or treatment for such incapacity due to a chronic serious health condition"—which requires that the employee make periodic visits for treatment by a health care provider and that the condition continue over an extended period of time and may cause episodic rather than a continuing period of incapacity, or (3) a "period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective." 29 C.F.R. § 825.115.[7]  The regulations further provide that "[o]rdinarily, unless complications arise, the common cold, the flu, ear aches, upset stomach, minor ulcers, headaches other than migraine, routine dental or orthodontia problems, periodontal disease, etc., are examples of conditions that do not meet the definition of a serious health condition and do not qualify for FMLA leave." 29 C.F.R. § 825.113(d).

---

[7] The regulations define "incapacity" to mean "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113(b).  The regulations state that the term "treatment" includes "examinations to determine if a serious health condition exists and evaluations of the condition" and that "[a] regimen of continuing treatment includes, for example, a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition (e.g., oxygen)." 29 C.F.R. § 825.113(c).  The regulations further provide that "[a] regimen of continuing treatment that includes the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider, is not, by itself, sufficient to constitute a regimen of continuing treatment for purposes of FMLA leave." 29 C.F.R. § 825.113(c).

To establish a prima facie claim for interference with FMLA rights, a plaintiff must establish five elements: "(1) that he is an eligible employee under the FMLA; (2) that defendant is an employer as defined in the FMLA; (3) that he was entitled to take leave under the FMLA; (4) that he gave notice to the defendant of his intention to take leave; and (5) that he was denied benefits to which he was entitled under the FMLA." Achille v. Chestnut Ridge Transp., Inc., 584 F. App'x 20, 21 (2d Cir. 2014) (summary order) (quoting Higgins v. NYP Holdings, Inc., 836 F. Supp. 2d 182, 193 (S.D.N.Y. 2011)) (alterations omitted).

To meet the notice requirement, the employee must give sufficient information to the employer "to provide reasonable notice that the employee requests time off for a serious health condition." Slaughter v. Am. Bldg. Maint. Co. of New York, 64 F. Supp. 2d 319, 325 (S.D.N.Y. 1999); see also 29 C.F.R. § 825.303 (providing that when timing of the need for leave is not foreseeable, "an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case" and must "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request"). "Merely calling in sick . . . is insufficient to put a company on notice that an employee is requesting leave that may be eligible under the FMLA." Brown v. The Pension Boards, 488 F. Supp. 2d 395, 409 (S.D.N.Y. 2007); see also Slaughter, 64 F. Supp. 2d at 326 (collecting cases that granted summary judgment to the employer where "notice supplied to the employer was patently insufficient to inform the employer of the employee's qualified reason for taking leave"). The employee

23

need not expressly invoke the FMLA in her notice to the employer, but must give a basis for her leave that qualifies under the FMLA.  <u>Brown</u>, 488 F. Supp. 2d at 408-09.  Once the employee provides the requisite notice, "the employer is on inquiry notice and bears the burden of ascertaining whether the leave qualifies for FMLA protection."  <u>Garraway v. Solomon R. Guggenheim Found.</u>, 415 F. Supp. 2d 377, 383 (S.D.N.Y. 2006).

    C.    <u>Title VII</u>

Title VII prohibits employment discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin."  42 U.S.C. § 2000e-2(a).  Hostile work environment and disparate treatment claims are two theories of claims that fall within the umbrella of Title VII.  <u>See</u>, <u>e.g.</u>, <u>Demoret v. Zegarelli</u>, 451 F.3d 140, 153-54 (2d Cir. 2006); <u>Alfano v. Costello</u>, 294 F.3d 365, 372 (2d Cir. 2002).

    1.    <u>Hostile Work Environment</u>

Although not clearly pled as such, plaintiff's Title VII claim may be construed as pleading a hostile work environment claim on the basis of race.  (<u>See</u> Compl. ¶¶ 66-70.)  A hostile work environment claim under Title VII requires a showing that: (1) "the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and (2) "a specific basis exists for imputing the objectionable conduct to the employer."  <u>Alfano</u>, 294 F.3d at 373.  "The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered."  <u>Id.</u>  "The incidents

must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997). The misconduct shown must reach the level of an "objectively hostile or abusive work environment" and the victim must "subjectively perceive the environment to be abusive." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

        2.   Disparate Treatment

Employment discrimination claims asserting disparate treatment under Title VII are analyzed under the three-step burden-shifting framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). "To overcome a motion for summary judgment under Title VII, a plaintiff must first satisfy an initial burden of 'proving by the preponderance of the evidence a prima facie case of discrimination.'" Robinson v. Concentra Health Servs., Inc., 781 F.3d 42, 45 (2d Cir. 2015) (quoting Burdine, 450 U.S. at 252-53). "[T]he plaintiff must demonstrate that: (1) she fell within a protected class under Title VII; (2) she was qualified for the position she held; (3) she was subjected to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." Id. "The requirements to establish a prima facie case are 'minimal,' and a plaintiff's burden is therefore not 'onerous.'" Bucalo v. Shelter Island Union Free Sch. Dist., 691 F.3d 119, 128 (2d Cir. 2012) (citations omitted).

If the plaintiff succeeds in proffering sufficient evidence in support of the prima facie case, the burden of production shifts to the defendant to present evidence in support of a defense that "the adverse employment actions were taken

for a legitimate, nondiscriminatory reason." Id. at 128-29 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993); Burdine, 450 U.S. at 254) (quotation marks omitted).  "[W]hile the presumption shifts the burden of production to the defendant, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. at 129 (quotation marks and alterations omitted).

If the defendant satisfies its burden of production, the presumption raised by the prima facie case is rebutted and drops from the case; "the plaintiff then has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision—a burden that merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." Id. (citing Burdine, 450 U.S. at 256) (quotation marks omitted); see also Littlejohn v. City of New York, 795 F.3d 297, 307 (2d Cir. 2015) ("[O]nce the employer presents evidence of its justification for the adverse action, joining issue on plaintiff's claim of discriminatory motivation, the presumption drops out of the picture and the McDonnell Douglas framework is no longer relevant." (quotation marks omitted)).

D.    NYCHRL

Section 8–107(1)(a) of the NYCHRL makes it "an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of the actual or perceived . . . race, creed, color, national origin . . . [or] disability. . . of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."  N.Y.C. Admin. Code § 8–107(1)(a); see Mihalik v. Credit

Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 110 (2d Cir. 2013).  Pursuant to amendments enacted by the New York City Council in the Local Civil Rights Restoration Act of 2005 (which resulted from the City Council's view that the NYCHRL had previously been "construed too narrowly"), "courts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible."  Mihalik, 715 F.3d at 109 (citations and quotation marks omitted).

　　E.　Supplemental Jurisdiction

A court may exercise supplemental jurisdiction over state law claims when they are "so related to claims" as to which the court has original jurisdiction "that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a); see also City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 165 (1997).  The claims must "derive from a common nucleus of operative fact," such that plaintiff "would ordinarily be expected to try them all in one judicial proceeding."  United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966).

The exercise of such supplemental jurisdiction is discretionary, and a district court "may decline to exercise supplemental jurisdiction" over a state law claim if it "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3); Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial

economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n.7 (1988); <u>see also</u> <u>Gibbs</u>, 383 U.S. at 726-27 ("[I]f it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals."); <u>Seabrook v. Jacobson</u>, 153 F.3d 70, 72 (2d Cir. 1998) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.").

IV.     DISCUSSION

    A.     <u>FMLA Claim</u>

Plaintiff alleges that both defendants unlawfully interfered with, or withheld, FMLA benefits to which she was entitled in October 2012 and December 2012. (<u>See</u> Compl. ¶¶ 43-44, 54-59, 72-73.) Specifically, plaintiff contends that she was entitled to FMLA benefits because she suffered from chronic respiratory conditions. (<u>See</u> Pl.'s Opp. Br. at 19; Defs.' 56.1 ¶ 82 (stating that, in plaintiff's deposition, she described the medical condition upon which she bases her FMLA claim as an "upper respiratory and lower respiratory infection").) Defendants argue that they are entitled to judgment as a matter of law as to this claim because she cannot show that she suffered from a "serious health condition" as defined under the statute and failed to provide sufficient notice of her need for FMLA leave as required to

28

establish her prima facie case.  (Defs.' Opening Br. at 14-17.)  The Court agrees that defendants are entitled to judgment as a matter of law on both alternative grounds.

First, plaintiff's respiratory conditions do not qualify as a chronic serious health condition under the FMLA.  As explained above, FMLA benefits, as relevant here, apply when an employee requires leave because of a "serious health condition."  29 U.S.C. § 2612(a)(1).  The term "serious health condition" is defined to include either "inpatient care" or "continuing treatment by a healthcare provider."  29 U.S.C. § 2611(11).  Plaintiff does not contend that she received inpatient care, instead relying solely on a determination that she received qualifying continuing treatment.  "Continuing treatment," in turn, is defined in the Department of Labor's implementing regulations.  Those regulations require, in relevant part, that the employee suffered "any period of incapacity or treatment for such incapacity due to a chronic serious health condition."  29 C.F.R. § 825.115.[8]  Plaintiff asserts that her qualifying chronic health condition were the "chronic respiratory conditions" with which she was diagnosed by Dr. Rafique in 2012.  (Pl.'s Opp. Br. at 19.)

For a medical condition to qualify as a "chronic serious health condition," the Department of Labor's regulations require that the condition be one which "(1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider; (2)

---

[8] Plaintiff does not seek to rely on the other alternative definitions of "continuing treatment," which include a "period of incapacity of more than three consecutive, full calendar days" or a "period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective."  29 C.F.R. § 825.115.  In any event, the record does not contain any facts that would support plaintiff's entitlement to FMLA benefits under either of these categories, as there was no instance in which plaintiff was incapacitated for more than three consecutive calendar days in 2012.

Continues over an extended period of time (including recurring episodes of a single underlying condition); and (3) May cause episodic rather than a continuing period of incapacity (e.g. asthma, diabetes, epilepsy, etc.)." 29 C.F.R. § 825.115(c).  Even when viewing the record in the light most favorable to plaintiff, as the Court must in resolving this motion, plaintiff's absences in October 2012 and December 2012 plainly were not caused by a condition that meets the statutory and regulatory requirements.

As to plaintiff's October 4 and 5, 2012 absences, plaintiff testified that her appointment was for a sinus condition; Dr. Rafique testified that the appointment was for a "runny nose." (Defs.' 56.1 ¶¶ 119, 120.)[9]  Dr. Rafique testified that plaintiff denied having fever, chills, fatigue, chest pains or swollen glands and that plaintiff's respiratory condition was considered normal, and her chest and lungs were clear.  (Defs.' 56.1 ¶¶ 121, 122.)  As to plaintiff's December 12 and 13, 2012 absences, Dr. Rafique testified that plaintiff's December 12 appointment was for "allergic symptoms, runny nose and sneezing" and stated that plaintiff's eyes, ears, sinuses, mouth, airway, chest and lungs were normal, and her vital signs were good. (Defs.' 56.1 ¶¶ 142, 144.)  On December 11, the day before plaintiff had to leave the office because she was sick, plaintiff had emailed a friend at work saying that she had a cold.  (Defs.' 56.1 ¶ 135.)  Dr. Rafique testified that it would not have surprised her if plaintiff had worked on October 4 and 5 (the days she was absent),

---

[9] Dr. Rafique also testified that the appointment was related to plaintiff's lumbar back problem—in relation to which plaintiff took FMLA leave in 2011 (Defs.' 56.1 ¶ 120)—but plaintiff has not claimed that she was entitled to FMLA benefits in 2012 on the basis of her back condition.

and that it would not have surprised her if plaintiff returned to work on December 14, which she did.  (Defs.' 56.1 ¶¶ 124, 150.)

Based on this evidence, there is nothing to suggest that plaintiff's condition causing her October 2012 and December 2012 absences were caused by a chronic respiratory condition that could be considered "serious" as understood under the FMLA.  Although there is evidence to support plaintiff's claim that she had chronic asthma, allergies or bronchitis, there is no evidence to support a determination that plaintiff's condition was serious or that it resulted in any incapacity (i.e. an inability to work) as required to entitle an employee to FMLA leave.  See Dalton v. ManorCare of W. Des Moines IA, LLC, 782 F.3d 955, 961 (8th Cir. 2015) (affirming grant of summary judgment on FMLA claim where plaintiff's edema and fluid retention did not result in any incapacity other than brief absences to obtain medical diagnosis and treatment); Price v. Marathon Cheese Corp., 119 F.3d 330, 335 (5th Cir. 1997); see also Phinizy v. Pharmacare, 569 F. Supp. 2d 512, 521 (W.D. Pa. 2008) (granting summary judgment where bouts of bronchitis did not necessitate periodic visits for treatment and plaintiff missed only seven days of work for bronchitis over two year period of complaint); Boyce v. New York City Mission Soc., 963 F. Supp. 290, 298-99 (S.D.N.Y. 1997) (stating that it is clear from legislative history that "Congress intended 'serious health condition' to mean serious illnesses and not minor health conditions").

Second, even if plaintiff's respiratory conditions arguably fell within the scope of a "chronic serious health condition" under the FMLA, defendants are nonetheless

31

entitled to judgment as a matter of law because plaintiff failed to provide sufficient notice of her need for FMLA leave in October 2012 and December 2012.  As explained above, to establish a prima facie claim for interference with or unlawful withholding of FMLA benefits, a plaintiff must show that she gave sufficient information to her employer "to provide reasonable notice that the employee requests time off for a serious health condition."  Slaughter, 64 F. Supp. 2d at 325; see also 29 C.F.R. § 825.303.

There is no evidence in the record to suggest that plaintiff gave defendants reasonable notice that her October 2012 and December 2012 absences were caused by a serious health condition; plaintiff only made defendants aware that she was sick in a generic way that did not put defendants on inquiry notice that plaintiff might qualify for FMLA benefits.  When plaintiff returned to work on October 8, she produced only a generic note from Dr. Rafique that did not identify the nature of her illness.  (Defs.' 56.1 ¶¶ 126-27.)  In her October 15 memo to Perez, plaintiff stated only that her illness was sufficient to warrant her seeking medical attention for which prescription medication and rest were prescribed.  (Defs.' 56.1 ¶¶ 65, 67.)  Similarly, after plaintiff left work on December 12—by car service, rather than by ambulance as Perez had offered—because she was feeling sick, Dr. Rafique sent a note to Crowell stating that plaintiff could return to work on Monday, December 17, without indicating the medical condition causing plaintiff's absence.  (Defs.' 56.1 ¶¶ 137-40.)  In her December 15 email concerning the termination of her employment, plaintiff made no reference to any FMLA or disability-related claims, and twice

described her absences in October and December as "temporary illnesses." (Defs.' 56.1 ¶¶ 78, 153, 196.)

Regardless of whether defendants were aware of plaintiff's unrelated back condition and migraine headaches (Defs.' 56.1 ¶ 154), or that Perez knew that plaintiff "had ongoing respiratory problems and kept an inhaler," (Rivera Aff. ¶¶ 61-63; Pl.'s 56.1 ¶ 1), plaintiff did not, as a matter of law, provide sufficient information to put defendants on inquiry notice that her October 2012 and December 2012 absences could qualify for FMLA leave.  E.g., Mathew v. N. Shore - Long Island Jewish Health Sys., Inc., No. 11-CV-6022, 2013 WL 5799883, at *7-8 (E.D.N.Y. Oct. 23, 2013) aff'd sub nom. Mathew v. N. Shore-Long Island Jewish Health Sys., Inc., 582 F. App'x 70 (2d Cir. 2014); Beligotti-Fenti v. Paychex, Inc., No. 08-CV-6019, 2009 WL 3756954, at *6 (W.D.N.Y. Nov. 6, 2009).[10]  Even where an employer has knowledge that an employee suffers from a chronic medical condition, the employee must notify her employer that the specific absence at issue is due to that known chronic condition.  Golden v. New York City Dep't of Envtl. Prot., No. 06 CIV. 1587 (DLC), 2007 WL 4258241, at *2 (S.D.N.Y. Dec. 3, 2007) aff'd, 354 F. App'x 577 (2d Cir. 2009).  The lack of sufficient notice here is further buttressed by plaintiff's repeated representations in April and May 2012—after the issue was specifically

---

[10] The two cases that plaintiff cites for the proposition that her notice was adequate, Strohl v. Brite Adventure Ctr., Inc., No. 08 CV 259 (RML), 2009 WL 2824585 (E.D.N.Y. Aug. 28, 2009), and Barnett v. Revere Smelting & Ref. Corp., 67 F. Supp. 2d 378 (S.D.N.Y. 1999), are both distinguishable from the facts established in the record presented here.  In Strohl, the plaintiff had specifically informed the employer that she was missing work to obtain treatment for her serious migraine headache condition, Strohl, 2009 WL 2824585, at *7, and in Barnett, the plaintiff had previously informed his manager and the nurse at the employer's on-site medical unit that he had been diagnosed with a serious heart condition and that plaintiff was concerned the condition might cause him to miss work, Barnett, 67 F. Supp. 2d at 386-87.

raised by Perez—that she did not believe her prior absences qualified for FMLA leave.  (Defs.' 56.1 ¶¶ 57, 59.)  The FMLA does not impose a requirement that an employer jump to conclusions about an employee's health status or probe into the severity of an undisclosed illness.  See Basso v. Potter, 596 F. Supp. 2d 324, 339 (D. Conn. 2009) ("[T]he 'FMLA does not require employers to play Sherlock Holmes, scanning an employee's work history for clues as to the undisclosed, true reason for an employee's absence.'" (quoting de la Rama v. Illinois Dep't of Human Servs., 541 F.3d 681, 687 (7th Cir. 2008))); Johnson v. Primerica, No. 94 Civ. 4869(MBM)(RLE), 1996 WL 34148, at *5 (S.D.N.Y. Jan. 30, 1996) ("[T]he employer is not required to be clairvoyant.").

Perez argues that she is also independently entitled to dismissal as to the FMLA claim because she is not an "employer" as defined by the FMLA.  (Defs.' Opening Br. at 21.)  A person may only be held individually liable under the FMLA if that person is an "employer."  Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 365 (S.D.N.Y. 2012).  As defined in the relevant regulations, the term employer can include "any person who acts directly or indirectly in the interest of an employer to any of the employer's employees."  29 C.F.R. § 825.104(d).  Under the "economic reality" test that has been adopted in this Circuit, "courts consider whether the alleged employer '(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'"  Malena, 886 F. Supp. 2d at 365 (quoting Herman v. RSR Sec. Servs., Ltd.,

172 F.3d 132, 139 (2d Cir. 1999)).  There is no triable issue of fact in this record that Perez did not have sufficient authority to qualify as an "employer" under the FMLA. Perez is therefore independently entitled to dismissal of the FMLA claim on this basis.

B.     Title VII Claim

Plaintiff alleges that defendant Crowell discriminated against her on the basis of her Hispanic race in violation of Title VII.  (Compl. ¶¶ 17-24, 66-70.)[11] Although not clearly pled as such, plaintiff's Title VII claim, when construed in the light most favorable to plaintiff, appears to include a hostile work environment as well as a disparate treatment claim.  (See Pl.'s Opp. Br. at 7-12.)  Crowell argues that plaintiff's hostile work environment claim fails because she has not presented evidence of sufficiently severe or pervasive conduct, and that her disparate treatment claim fails because plaintiff has not shown that any adverse action occurred under circumstances giving rise to an inference of discrimination or that Crowell's non-discriminatory reason for terminating plaintiff was not the true reason for that action.  The Court agrees that, however construed, plaintiff has

---

[11] In her opposition brief, plaintiff for the first time asserts that she was also discriminated against on the basis of her Puerto Rican national origin.  (Pl.'s Opp. Br. at 1, 6 n.1.)  Claims based on racial bias and national origin are conceptually distinct; generally, a plaintiff's raising of a claim of race discrimination does not suffice to also raise a claim of national origin discrimination.  Dixit v. City of New York Dep't of Gen. Servs., 972 F. Supp. 730, 734 (S.D.N.Y. 1997) ("An assertion of racial bias is conceptually distinct from a claim of discrimination on the basis of national origin.  Therefore, raising a claim of national origin discrimination before the EEOC will not suffice to exhaust a charge of discrimination on the basis of race.").  That being said, courts have indicated that an employee's designation that she is Hispanic may be suggestive of both race and national origin.  See Deravin v. Kerik, 335 F.3d 195, 201-02 (2d Cir. 2003).  Moreover, while her complaint expressly references only race discrimination, in her charge of discrimination to the EEOC, plaintiff checked boxes for both race and national origin discrimination.  (See Guthrie Decl., Ex. 40.)  The Court therefore construes plaintiff's allegations as having properly asserted a Title VII claim based upon both race and national origin discrimination, although this does not alter the Court's analysis.

failed to present sufficient evidence to allow either a hostile work environment or disparate treatment Title VII claim to survive summary judgment.

First, as to plaintiff's hostile work environment claim, it is clear that plaintiff has failed to present evidence that creates a genuine issue of fact as to whether any harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Alfano, 294 F.3d at 373. As set forth above, plaintiff's hostile work environment claim is based on comments that Perez purportedly made on three particular occasions, as well as a generalized claim that Perez cursed in Spanish inside her office (in conversations in which the language was not directed to or at plaintiff, but which plaintiff overheard from her desk and made her feel uncomfortable). Perez's three specific comments included (1) a conversation among several secretaries, including plaintiff, in Crowell's lunch room in 2011 in which Perez referred to Puerto Ricans as "lazy" and said that "Spanish people always complain," (2) a conversation between plaintiff, Perez and Ayala in late 2011 or early 2012 regarding child care in which Perez stated that "usually Spanish grandmothers are more hands on," and (3) a conversation between plaintiff and Perez regarding plaintiff's use of APL time, during which Perez said "Spanish people tend to spend more than they have." (Defs.' 56.1 ¶¶ 157-61.)

Standing alone, these few stray comments spanning more than a year are insufficiently severe or pervasive when considered in their totality to constitute an "objectively hostile or abusive work environment." Harris, 510 U.S. at 21; see also Redd v. New York Div. of Parole, 678 F.3d 166, 175-76 (2d Cir. 2012) ("Isolated

incidents usually will not suffice to establish a hostile work environment, although we have often noted that even a single episode of harassment can establish a hostile work environment if the incident is sufficiently 'severe.'"); Perry, 115 F.3d at 149; Cadet v. Deutsche Bank Sec. Inc., No. 11 CIV. 7964 CM, 2013 WL 3090690, at *9 (S.D.N.Y. June 18, 2013) ("Conduct that is merely offensive, unprofessional, or childish cannot support a hostile work environment claim.  Nor can offhand comments, isolated incidents, stray remarks, or the plaintiff's subjective belief constitute a viable claim." (alterations omitted)).

Second, as to plaintiff's disparate treatment claim, plaintiff has failed to present sufficient evidence of a discriminatory motive to rebut Crowell's proffered non-discriminatory reason that plaintiff was terminated because she exceeded her APL.  The only adverse employment action that plaintiff identifies in support of her disparate treatment claim is the termination of her employment in December 2012. (Pl.'s Opp. Br. at 10.)[12]  Assuming arguendo that plaintiff presented sufficient evidence to satisfy the minimal initial burden to establish the prima facie case under the first stage of the McDonnell Douglas framework, Crowell has come forward with a non-discriminatory explanation for plaintiff's termination—it asserts that plaintiff was terminated for exceeding her APL after repeatedly being

---

[12] To the extent that plaintiff's claim could also be construed as asserting that plaintiff suffered an adverse employment action because Perez was rude to Hispanic secretaries and issued worse working schedules to them compared to Caucasian secretaries (see Defs.' 56.1 ¶¶ 169-72), plaintiff has not presented sufficient evidence to show that these actions led her to endure "a materially adverse change in the terms and conditions of employment."  Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (quotation marks omitted).  That standard requires that the change in conditions be "more disruptive than a mere inconvenience or an alteration of job responsibilities." Id.

warned not to do so.  The <u>McDonnell Douglas</u> framework therefore drops away and, to defeat summary judgment, plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision."  <u>Burdine</u>, 450 U.S. at 256. Plaintiff may do this either directly by showing that a discriminatory reason more likely motivated Crowell or indirectly by showing that Crowell's proffered explanation is unworthy of credence.  <u>Id.</u>; <u>see also</u> <u>St. Mary's</u>, 509 U.S. at 514.

Plaintiff's evidence supporting her disparate treatment claim solely relates to purported discriminatory practices engaged in by Perez, including that Perez was friendlier with Caucasian secretaries, unfairly reprimanded Hispanic secretaries, was rude to Hispanic secretaries, issued worse working schedules and assignments to Hispanic secretaries, and constantly harassed plaintiff regarding her use of APL. (<u>See</u> Defs.' 56.1 ¶¶ 167-90.)  As explained below, the evidence supporting these allegations is insufficient to rebut Crowell's proffered non-discriminatory reason and raise a genuine issue of material fact.

First, aside from wholly conclusory assertions as to Perez's comparative treatment of Hispanic and non-Hispanic secretaries, plaintiff offers no evidence showing that Perez treated Hispanic secretaries less favorably than others.  (<u>See</u> Defs.' 56.1 ¶¶ 199-202 (stating that Ayala testified that no secretary at Crowell liked Perez, that Perez was a "bitch" and that this affected secretaries of all races).)

Second, even when considered in its totality and in the light most favorable to plaintiff, the proffered evidence is insufficient to rebut Crowell's non-discriminatory reason for plaintiff's termination.  Plaintiff's only evidence relating to Perez's unfair

reprimanding of Hispanic secretaries was that Perez told Ayala that her skirt was too short and her bra strap was showing, an assessment with which Ayala herself agreed.  (Defs.' 56.1 ¶ 168.)  Plaintiff's claim that Hispanic secretaries were disparately reprimanded in comparison to secretaries of other races is also belied by plaintiff's testimony that Perez "targeted" Petri, a Caucasian secretary.  (Defs.' 56.1 ¶ 198.)  As to plaintiff's claim that Perez issued worse working schedules to Hispanic secretaries, this is belied by plaintiff's concession that Perez regularly approved plaintiff's requests for schedule changes (Defs.' 56.1 ¶¶ 170-71), that Ayala was satisfied with the attorneys to whom she was reassigned after her transfer (Defs.' 56.1 ¶¶ 174-75), and that two Caucasian secretaries, [REDACTED] and [REDACTED], complained about Perez and about scheduling and assignment changes she had made (Defs.' 56.1 ¶¶ 176-77).

Furthermore, as to plaintiff's claim that she was disparately harassed regarding her use of APL, the record contains no evidence that Perez treated plaintiff, or any other Hispanic employee, worse than she treated similarly situated employees with low APL balances.  (Defs.' 56.1 ¶¶ 182-84.)  Rather, plaintiff does not dispute that in October 2011 Perez sent cautionary emails to thirteen employees about low APL balances, only four of whom were Hispanic.  (Defs.' 56.1 ¶ 184.)  To the extent that plaintiff seeks to compare her treatment in terms of APL usage to Andress, the one secretary who was given an accommodation, plaintiff has failed to show that she was similarly situated to Andress in all material respects.  See Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997) ("To be

'similarly situated,' the individuals with whom [plaintiff] attempts to compare herself must be similarly situated in all material respects."). The evidence in the record shows that Andress was given a special exemption as part of a bargain struck between Crowell and KPH when Crowell acquired that firm. (Defs.' 56.1 ¶ 185.)

Third, whereas all of the conduct that plaintiff claims tends to support an inference of discrimination is attributed to Perez, plaintiff does not dispute that it was Guthrie—Crowell's Chief Human Resources Officer—who had the ultimate authority to make, and who did make, the decision to terminate her employment. (Defs.' 56.1 ¶¶ 75-76, 152.) Plaintiff has presented no evidence that Guthrie was motivated by discriminatory animus in her decision to terminate plaintiff. Thus, even if plaintiff had presented sufficient evidence to show that Perez had discriminatory animus towards Hispanic employees, that is irrelevant to Guthrie's decision to terminate plaintiff for exceeding her APL regardless of whatever minimal role Perez played in the termination decision.

C.    NYCHRL Claims

Finally, plaintiff alleges three claims under the NYCHRL for hostile work environment, race discrimination, and disability discrimination. (Compl. ¶¶ 75-85.) Before addressing the merits of plaintiff's NYCHRL claims, however, the Court must decide whether to retain supplemental jurisdiction over these claims in light of the Court's dismissal of plaintiff's federal law claims. See 28 U.S.C. 1367(c). The Court concludes that it should not do so.

Below (and in the legal standards section above), the Court sets forth the standard applicable to NYCHRL claims.  In short, as a result of a law passed by the New York City Council in 2005, that standard has evolved to the point that even claims of discrimination supported by only the flimsiest evidence, as is the case here, are difficult—although not impossible—for a federal court to resolve on summary judgment.  This Court believes this action is totally baseless and that no reasonable juror could conclude otherwise.  Nonetheless, the current state of the law suggests that that standard applied to even such baseless claims could result in their survival.  This, frankly, makes no sense.  Our courts—federal and state— should be for resolution of actions which pass some threshold of merit.  A higher threshold than case law now suggests.  This Court strongly urges New York State court judges, and the New York City Council, to carefully review this standard and tighten it as appropriate.  While New York City is well within its rights to enact a more stringent anti-discrimination statute than that applicable under federal or state law, it does not further the interests of justice to have insubstantial claims absorb the resources of our judicial system and crowd out meritorious ones.  This Court hopes that New York State appellate courts and/or the New York City Council empower trial courts with the tools to differentiate between the baseless and the substantial at an earlier stage than trial.

While plaintiff's FMLA and Title VII claims share similarities with plaintiff's NYCHRL claims, the NYCHRL, as discussed above, "sets out a different, more liberal standard" from that of Title VII.  Vuona v. Merrill Lynch & Co., 919 F. Supp.

2d 359, 393 (S.D.N.Y. 2013) (declining to exercise supplemental jurisdiction over NYCHRL claims were Title VII claims were dismissed).  Second Circuit precedent dictates that NYCHRL claims must be analyzed "separately and independently from any federal or state law claims" and that courts must construe the NYCHRL "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible."  Mihalik, 715 F.3d at 109.  For instance, in Mihalik, the Second Circuit, relying on a decision from the First Department, stated that, to survive summary judgment, a discrimination plaintiff need not show that the challenged conduct was "severe" or "pervasive" or that it was "tangible"—just that the plaintiff was "treated less well" because of a discriminatory intent.  Id. at 110 (quotation marks omitted).

Because the NYCHRL claims would require a separate and independent analysis, and because plaintiff alleges a claim for disability discrimination under that law but did not do so under Title VII, this Court concludes—as numerous courts within this district have done—that it is appropriate to decline to exercise supplemental jurisdiction over plaintiffs' NYCHRL claims.  E.g., Vuona, 919 F. Supp. 2d at 393; Williams v. New York City Health & Hosps. Corp., No. 11 CIV. 9456 KBF, 2012 WL 5506128, at *6 (S.D.N.Y. Nov. 13, 2012) (declining to exercise supplemental jurisdiction over NYCHRL claims because the "particularly expansive definition of discrimination" under the statute made it "an appropriate situation to permit New York courts to evaluate the scope of their own laws for themselves"); Trinidad v. New York City Dep't of Correction, 423 F. Supp. 2d 151, 169 (S.D.N.Y.

2006).  The Court's decision is also supported by its belief that neither party is likely to be prejudiced by this decision, as discovery has been completed and it does not appear that any discovery would need to be repeated if plaintiff's NYCHRL claims are re-filed in state court.  See Murray v. Visiting Nurse Servs. of N.Y., 528 F. Supp. 2d 257, 280-81 (S.D.N.Y. 2007); see also N.Y. C.P.L.R. 205(a) (allowing a plaintiff to recommence a dismissed suit within six months without regard to the statute of limitations).

Accordingly, the Court declines to exercise supplemental jurisdiction over plaintiff's NYCHRL claims; those claims are therefore dismissed without prejudice. The Court notes, however, that plaintiff's claims of discrimination appear to be without merit and are supported by only a minimal, if any, evidentiary basis in the record.

V.   CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED as to plaintiff's claims under the FMLA and Title VII.  Those claims are dismissed with prejudice.  Because the Court declines to exercise supplemental jurisdiction over plaintiff's NYCHRL claims, those claims are dismissed without prejudice.

The Clerk of Court is directed to terminate this action.

SO ORDERED.

Dated:         New York, New York
               February 18, 2016

_____
          KATHERINE B. FORREST
          United States District Judge